14-56-32 Montaigne Taylor v. Mark Thomas Good morning, your honors. I'd like to reserve four minutes of our time. You may. I'm Bruce Kramer of the Memphis Bar. With me is Richard Myers. We represent Mark Thomas in this case. It's been a while since I've been on the banks of the Ohio. And I'm reminded of something I was told in 1969 when I clerked for Robert McRae, Jr., that it doesn't do any good to win them on the banks of the Mississippi if you can't hold them on the banks of the Ohio. And in this case, we're asking this court to undo what was done on the banks of the Mississippi and to reverse the holdings by Judge McCullough of the district court. And I'd briefly like to just go through some of the reasons. This is a case where I think my three years of Latin helped me. It's conditio sine qua non. That's what I was thinking, too. They say that all the time up there. We think alike, Judge. And those conditions to sustain the decisions by Judge McCullough are following. This is, as the court knows, two claims that primarily are made. One under the Tennessee Consumer Protection Act and the other under the Lanham Act. Under the Tennessee Consumer Protection Act, there is no standing by the plaintiff in this case to bring this case. She's not a consumer. But the statute nowhere says she needs to be. Well, yes, it does, with all due respect, Your Honor. So what provision should I be asking for? As we set forth in the brief, the whole purpose. Okay, I'm not asking for the purpose. I want to talk about what the act says. Well, all the cases that interpret it, but for Bridgeport State, it's for a consumer. Well, I mean, I can envision some sort of loose characterization type language and opinion saying this is a consumer statute. But what I'm not aware of is a case that says only consumers can bring suit. And as a matter of fact, this ATS Southeast case, are you familiar with that? Very much so. Okay. But the ATS case. I thought they said there you don't have to be a consumer. That's not quite what they said in that case. What they were doing interpreting in that case was the definition of person. Prior to the 1989 amendment. Isn't that what governs this question? I mean, it says any person. It's ironic. I literally had the same case issue with the federal statute. What does any person mean? Earlier this week, it's like Groundhog Day. But any person who suffers an ascertainable loss may bring an action. That sounds like a standing. Something that would address your standing. What they were talking about in the ATS was they were talking about Syncorp. And what they were interpreting is whether or not prior to that it was a natural person. And the question in ATS is, is a corporation, can a corporation have standing? And they said, yes, a corporation can. Earlier this week in the federal statute. Who knows how it will come out. In the Lanham Act, the landmark Supreme Court case has a great analysis of this. And it talks about. Well, the Tennessee. It's going to be Tennessee law that governs this point. And the Tennessee cases, all the cases that come out on this case, out of the middle district of Tennessee in Nashville, which is where Bridgeport came out, have not followed Bridgeport. I mean, it's an outlier. Well, I don't know. I mean, the statute says any person who suffers an ascertainable loss. Who's a consumer. Is the word consumer in? In every case that follows that, yes, the PHK. Well, I guess I'm hung up on what the act actually says. But I sort of, you know, I think you've spoken to my questions on that. When you read PHG, the PHG case, which is a 2006 case, and if you look at Wagner versus Fleming, and even the RobMed case, they all constantly, considerably use the word consumer. There has to be a right. The act doesn't tell. In those cases, they were consumers. All throughout the statute, it talks about consumer. That's what that act is to protect consumers, vis-a-vis. Why would they say any person rather than any consumer? They're not disjunctive. I mean, they're not mutually exclusive. Otherwise, you don't need a Tennessee Consumer Protection Act. You can just sue anybody. When you're drafting, and some of us draft things, if you are, in fact, limiting it to consumers, would you not normally say any consumer rather than any person? Well, I don't want to take all the responsibility for legislators, either in Nashville or in Washington, on how they draft statutes. So we've clarified the distinction, at least. Go ahead. And I think we've set forth in detail in our briefs, and I don't want to belabor that. I know you have a lot of arguments, probably. But, you know, it's hard to say in a 10-minute situation to encapsulate the whole thing. So even if Your Honor says, okay, Ms. Fontaine as an individual is a consumer or is covered, and she doesn't have to be a consumer under that act, then you have to get into whether or not she had anything to protect under the Tennessee Consumer Protection Act and under the Lanham Act. And it's our position that we set forth in the brief that the only thing she sued for, and if you look at her verified complaint and then the amended complaint, she sued for damages. She never asked for an accounting or for lost profits. And one of the problems in her complaint, both the original complaint that was filed and the amended complaint, and this is one of the problems that the district court had, I think, when you read all his orders, he conflated both the individual and the corporate entities and held them to be synonymous. So what did she have to protect? And the only thing she contended in the trial testimony, and this is also in our brief, is that she lost her goodwill. And it's our position that under the facts, and I don't think there's a lot of disagreement on the facts. I think the facts are really not disputed. It's how you interpret them. The fact that your client, frankly, almost copies her sign, which is a fact that I think is found in this record, that there was too much of a similarity, that's not a coincidence, presumably. Presumably it's because the mark did have value, right? Well, I differ with that. I don't think he copied the sign. There are elements that he took that he wanted and he branded, and the testimony of Berryhill during the trial said, I changed it enough that I thought there wasn't enough. Well, I know you might disagree, but if we just stipulate for purposes of discussion that. . . You always get a problem when you stipulate. Well, I'm not asking you to stipulate. You're a good trial lawyer. Hypothetically, hypothetically, if it was infringing in its similarity to her mark, then that suggests there was value. Well, I'm not saying there wasn't value. Okay, what are. . . He wanted to brand it. What I'm saying is, did she own goodwill? Did she have it? The goodwill that was associated with the Skyline mark was owned by a corporation. That corporation, Cohen, Etter, Fontaine, ceased doing business in February of 2011. To stay in business, where this case turns on, quote, this implied assignment, and we cover this in quite some detail, there was, first of all, there's the fact there was no written assignment during the time, okay? And so the judge fashioned this implied assignment, and. . . Is that so unreasonable? Yes, under the facts. Here are the facts, okay? Cohen, Etter, Fontaine was a going business, 30. . . I know the. . . I mean, I understand about the sale, and then, you know. . . There was no sale. There was no merger. Cohen, Etter, Fontaine went out of business in February of 2011. Right. No broker, no office. She joins cry-leaky. Cry-like, right. She joins as a sales agent, not as an administrator, not as a broker. There's no continuity. There's nothing. . . You know, so what did she carry forward? The judge's orders to try and find continuity is that Ms. Fontaine, as over here, when she was at Cohen, Etter, Fontaine, as the broker, as the manager of 30 people running a business, what she said was the whole ball of wax. They were sophisticated. They were high quality. Okay, February 11th, that ends. She is the whole owner of that, isn't she? Yeah, without a doubt. Okay? What about Yellowberry? Are you familiar with that case? I mean, it suggests that after Yellow. . . I thought it was Yellowberry. Yellowbook. Yellowbook. Does that ring a bell more? No, not even Yellowbird? 708 F3rd at 844. I think it's a pretty recent case. But it seems to say that even after the business stops operations, if an individual who owns the mark intends to resume. . . What's the name of the case? Yellowbook v. Brandberry. Yellowbook. All right. Phonebooks v. Brandberry. You were close. I wrote it. I was just familiar with it. I didn't think I'd written the Yellowberry. Having not read it, the way you described it, it says individual. In this case, she didn't own it. Okay, after all this, I must get my point about the case out. Okay? It says if the owner of the mark, after the business stops operations, if an owner of the mark intends to resume producing substantially the same product or service and does so within a reasonable time, then the goodwill for the mark remains with the owner. Why doesn't that apply here? She sure as heck intended to keep doing the same service. She became a salesperson, not a broker. She wasn't a manager. She's doing the same. If we're going to quarrel about this, it's going to be a long morning. I mean, she's doing the same service. She's not. She's a real estate agent. Is the difference between being a real estate agent and being a broker and a manager of 30 employees? And there's a 14-month hiatus. We'll just have to disagree on that point. It won't be the first or the last time that I've disagreed with a judge. Yeah, that's okay. Thank you, Counselor. You'll have your four minutes for rebuttal. Good morning. May it please the Court. My name is Shea Welford, and I represent Fontaine-Taylor. On the last point, I think, starting at the end, the comparison is that Mr. Kramer is in a posit. The service mark is associated with the business of Culminator Fontaine that began back in 1951, and it's been stipulated to and testified to at trial that that service mark had a great amount of value and signified high-end, significant, very good-dealing, good-negotiating real estate services. And that's what the service mark symbolized, and the provision of those services in the East Memphis real estate market, which is exactly what Ms. Taylor did when she went to trial. Well, I guess the concern I would have with your side of the case is how in the world do we come up with these numbers? Sure. Let me go through that, Your Honor. How is this not just a dart-throwing exercise by the jury? So your question is going to the Tennessee Consumer Protection Act? The efficiency of the evidence, frankly, as to the determination of the damages amount. On the Tennessee Consumer Protection Act claim, Your Honor? Yeah, I think basically all of them. I can start with the Lanham Act, Your Honor. Sure. Under the Lanham Act, under 1125A is where we brought our claim. Under 117A, the Lanham Act, when you ask for profits, a recovery of profits, which is what we took discovery on, presented at trial, presented our post-trial briefs on to Judge McCalla, those are awardable as damages to a plaintiff. And what a plaintiff has to show under 1117 and 1125A is that they own the mark, there was an infringement, and they show the defendant's profits. Many cases have said we'll award profits in a willfulness-type situation, but that's not a requirement, although there are a number of cases that say that. So within that framework, Judge McCalla, well, the jury, and Judge McCalla made the determination, heard evidence of a number of sales that took place while these signs were in the marketplace. He went through, in Mark Thomas' testimony, cross-examined him on home after home after home, on when it was listed, when it was sold, what signs were used, what signs were being used in the marketplace, what commission did he make on each one. On each one, he did keep 100% of those commissions. Those were his profits. The burden then under the Lanham Act. So the commission number is pure profit? The commission number is pure profit. And that's where we get the $96,000 while he was using the Skyline sign? Is that correct? Judge McCalla actually reduced it to $60,770. I guess, yeah, what was the reason for that? He went through the cases, and on several of the houses, he said that even though a sign might have been put out at one of the houses, I don't recall the address off the top of my head, but one of them, he said the sign was put out after the contract was signed, and so he didn't count that towards commission, and he used similar reasoning on another house and took those houses out of the equation for purposes of awarding profits under 1117A. And so Judge McCalla examined those commissions as the problem. The Lanham Act is disgorgement, and it's the $96,000 minus. He knocks out some of the houses, and that gets you to $60,000. And in the judgment, Your Honor, there are five or six pages that detail each one of the houses and how he came up to those numbers, and we had stipulated a lot of what the sales were, and so there were packets of information on each house submitted at trial. I saw the stipulations at least as to the addresses and the amounts. And that's the Lanham Act damages, so it's a disgorgement of profits under the Lanham Act, and then the burden shifts to the defendant to come up with any deductions that should be made from those. And the defendant's testimony was, well, he had a special deal at Keller Williams when he first moved there to be able to keep 100% of his commissions, and at that time he was keeping 100% of those commissions, so those were his profits, and he offered no further evidence with respect to a deduction or anything like that. Now, the defendant cite cases saying tort law, causation, those things should apply, and those things do apply if you're looking for a traditional damages-type award under the Lanham Act, which you can also seek, but that is not the theory under which we went. We asked for a disgorgement of his profits, and that's why those cases don't apply. Now, as to the Tennessee—are there any other questions? Okay, I understand your argument about disgorgement. It's just pinned right to his commissions. Yes. But then on the Tennessee Consumer Protection Act claim— Which is a different claim. Correct me if I'm wrong. We're asking what was the diminution in value to the goodwill of her mark as a result of his usage or dilution of it? Yes. Is that fair? That is a fair characterization, Your Honor. So under 109A of the Tennessee Consumer Protection Act, you have to show an ascertainable loss of a thing of value, and a thing of value— well, service marks have been determined to be things of value, and the law has recognized ways in which service marks, though intangible property, can be damaged. Two ways that were recognized as far as the evidence in this case is concerned are loss of control over a service mark and confusion. And those two things, as a matter of law, courts have said, those will diminish the value of a service mark. It's one of the things that Ms. Taylor testified about and Mr. Thomas was cross-examined about. Mr. Alexander testified about and Ms. Rohn testified about. So we did prove that there was the existence of this diminution in value to the service mark, that there was actual damage to the service mark. It doesn't have to be out-of-pocket damage to be an actual damage. When we're talking about intangible things, it's a little bit harder to talk about in those terms, but that is what the law has recognized. When you say that they testified to it, I mean, in what sense did they say, somebody told me that, oh, yeah, this other guy's got that mark and he's a bum? So on the loss of control issue, Ms. Taylor testified that she was unable to control the use of the service mark. Okay, loss of control I can see in the sense that that's just intrinsic. If somebody else is driving your car, you've lost control of the car. But on the other aspect. Certainly on the other aspect, which is the confusion aspect, we had testimony from Anne Rohn who testified that she saw the sign and the symbols and colors and sign that she saw she associated with Ms. Taylor and was confused when she saw Mr. Thomas. Was she, in fact, in the market for a house or selling a house? At that moment in the market, but she did testify that she was a consumer in the past and could be in the future of residential real estate services and had used those services and was familiar with them. Okay, I take at least some testimony there. Then how do you connect that to any particular amount? And also Mr. Alexander testified. Okay, I'll buy confusion for the moment, but then how do you tie that to some particular amount? We get the ascertainable loss. We get that there's an actual damage. We get there's loss of control and there's been confusion. And the jury was given the testimony of Mr. Thomas about what was going on and Ms. Taylor of what was going on in the marketplace and what sales were occurring in the marketplace while this infringing sign was taking place out there. And very importantly, they came up with a very different number than Judge McCullough did, $36,500 is what they came up with based upon the evidence that they heard regarding. They, the jury. They, the jury did, that the sales were occurring. And that was a different rubric, different instructions on how you would evaluate that TCPA Act claim. And they came up with a different amount of damages on it. How? What does that prove that it's different in the sense that it seems to me the disgorgement, Okay, the disgorgement I can now follow because maybe the sign didn't get him all of that profit, but he shouldn't have been doing it and he disgorges the profits. The amount, the amount of the confusion though, it might have been very, very tiny. That is there's not an indication that he stole sales from her with it or at least I didn't see it that way. That's correct, Your Honor. Okay, so that then wouldn't you have to have some thought that without the confusion it would be worth $200,000 and because of the confusion it was reduced to $150,000 or something. Did that $36,000 tie to any particular set of evidence? In other words, I looked at the numbers and I tried to parse them and chop them and slice them and I couldn't come up with any way to get $36,000 out of them. It was 25% of the total amount of commissions presented at trial. Of the total amount of commissions. And we don't That was, so to get that amount that would be $144,000. That's both the sales with the skyline sign and the wave sign. That's the $96,000 plus $50,000. Your Honor. $96,000 plus $50,000 and then take 25% of that would make some, at least the math would come out right, but number one that includes Okay, but that includes the sales that he made under the wave sign and it also There was one sale under the wave sign. But I mean to get that total number, that's, well you actually need two, don't you? $96,000 for the skyline plus two, the South Grove Park and the Normandy Road, those two add $50,000. $50,000 and $96,000 is $146,000. That's the way I got it. I had missed the 25%. But, so it's that because he made those sales, it diminished the value by an amount of 25%. Was there any theory for that? Your Honor, we don't, of course, know what happened in the jury room and how they came up with 25%. Okay, so the 25% is not in the record. That was just from the jury. That's just Okay, I'm okay with that. Alright, but if you say, in other words, nobody testified that, oh, the sign probably got 25% of the customers. The 25% doesn't appear in the record somewhere? I think it is one of the things that realtors believe that that's the amount that a supervising broker like Ms. Taylor would receive, but I do not believe that is in the record. Okay. Go ahead. So, and Judge Boggs, I think part of your question, too, was going to causation on why this, how that would tie to the numbers. But when you look back at causation on Tennessee law for the Tennessee Consumer Protection Act, when you're looking at what the acts were and was there causation as to damage existing, and there was causation as to damage existing through Mr. Thomas' acts of causing the loss of control and causing the confusion. That's where the causation lies. Then under Tennessee law, it is recognized that although the existence of damages cannot be uncertain, and they are not uncertain, the amount of damages, while uncertain, if there's any reasonable basis for them, can be awarded. And so the jury was able to take all of this evidence, look at it, and award damages under the Tennessee Consumer Protection Act. But going back, I'm sorry, to Judge Boggs' comments about 25 percent and where that comes from, you're essentially working backwards by adding the damaged numbers together, coming up with about 144,000, 145,000, and saying they chose a number that was roughly 25 percent of that. I cannot say. I can only look at the evidence presented and say that that's 25 percent of a certain number that was presented.  Okay, and you didn't, I'm not accusing you of anything improper. You suggested that in the industry there was a 25 percent figure, but you're not aware of any testimony or instructions to the jury or argument to the jury that in any way evoke that number. That 25 percent industry practice is not even in the record, so the jury wouldn't have been able to use that as any reason. We had realtors on the jury, but no, it was not in the record. I was about to say, unless they're realtors on the jury, which apparently you say they were. That's correct. But I thought the jury said that the wave sign was not infringing. They did. So wouldn't it have been improper? I guess we're totally speculating, but it would be improper then to include two properties that were sold with the wave sign. I don't think so, Your Honor, and here's why. When someone chooses, as Mr. Thomas did, to willfully and maliciously infringe, this sign has been out there since 1951. He used it with permission for 17 years. He copied it. When he chooses to do that and he associates himself with that and he puts it out there, even though there might be a different sign in front of this particular property, the market is out there with him being associated with that sign. So I don't think it's inequitable for him to be charged with all sales that took place. The reasoning would be he had had this infringing sign out there for some time and people had begun to associate him personally with the business represented by that sign. And then another sign where they have his name, they figure, oh, that's the guy who's connected with that sign. That would be the rationale, Your Honor. Okay. Anything else? Thank you, Counsel. Thank you. I have your four minutes for rebuttal. Briefly. I'd love to argue Yellow Book, but I haven't read it, so I don't want to do that. The district court conflated Fontaine Taylor individually with Coleman Eder Fontaine and just merged those two together, made them synonymous. They did the same thing in their complaint. The judge did the same thing for damages. And the case, I think it's WMC. Let me see if I can find that real quick. It's the WMC versus the WMS case where the Seventh Circuit, I wish it was a Sixth Circuit case, but we can borrow from them, says there are two distinct issues, actual damages and disgorgement of profits. And the problem that we have here with the calculation of damages is that the judge used the two different elements as one. In this case, they didn't seek a disgorgement of profits or lost profits. In fact, when the jury instructions were being proffered, they gave up that and said, we're just going on loss of goodwill. So what is the actual damage and how was it calculated? There is no rhyme or reason. The only proof in this case that was the testimony from Fontaine Taylor. Are you strictly addressing the TPCA, TCPA now? Yes, at this point, yes. And I'll get to the Lanham Act on that. But was the diminution, the loss of control of the goodwill, and the test for that is the value before, the infringing, and the value after. There's absolutely no proof in the record. So I'll just leave it with that. I mean, these things are hard. Goodwill is always hard to prove. Absolutely. It seems like your position boils down to we needed to get an expert to come in here and guess, frankly, as opposed to have the jury guess based on the commission, et cetera, evidence. To disgorge the profits is a different aspect. Yeah, I'm not talking about that. We're just talking about damages. And my point is – That's what he used for damages. Okay, but my point is it's very hard to measure goodwill pretty much anytime. Certainly it is. But the jury has to have some basis to determine that. They just can't speculate. We've been sitting here, and I've been hearing back and forth, where did this 25% come from? Look, this is what they gave. This is the thing. Well, that's roughly 25%. I mean, that's speculation back there. So I'll just leave that. There's no basis. The case is WMS versus WPC. It's a seven-circuit case where the court of appeals said to the district court, you conflated them and you mixed them together. I also want to deal on this issue with whether or not the TCPA is restricted to consumers. And if there's any question, and apparently there is, and it does, this court can certify to the Tennessee Supreme Court and say, does you have to be a consumer to have standing under that? We're not going to do that. What's your next argument? I'll just throw it out there. I'll do it for myself. Two to one, I've won cases on so. Anyway, the Lanham Act refers to persons as well. But in the Landmarks case, the good analysis on that, it just says persons in the Lanham Act. But the Supreme Court of the United States says you've got to look at the zone of protected interests. And in that case, it's competitive, anti-competitive deception. The same analysis should apply to the TCPA. Thank you, Your Honors. Thank you, Counsel. The case will be submitted. The remaining cases will be submitted on briefs, and you may adjourn.